Approved: *Russell Capone*
RUSSELL CAPONE
Assistant United States Attorney

ORIGINAL

Before: HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

15 MAG 0219

DOC #

------------------- x

UNITED STATES OF AMERICA         :   **COMPLAINT**

        - v. -                           :   Violation of 18 U.S.C. §
                                             1951
ILYA PETROV,                     :
  a/k/a "Soldat," and                COUNTY OF OFFENSE:
SUREN GADAYEV,                   :   NEW YORK

                                 :

            Defendants.

------------------- x

U.S. DISTRICT COURT FILED
JAN 25 2015
D.S.
S.D. OF N.Y.

SOUTHERN DISTRICT OF NEW YORK, ss.:

   NAUSHAUN C. RICARDS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

### COUNT ONE

   1.   Between in or about November 2014, up to and including on or about January 25, 2015, in the Southern District of New York and elsewhere, ILYA PETROV, a/k/a "Soldat," and SUREN GADAYEV, the defendants, knowingly did attempt to commit extortion, and did commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, PETROV and GADAYEV used threatened force to collect payment from a confidential source for a real estate deal in which PETROV and GADAYEV lost money.

   (Title 18, United States Code, Sections 1951 and 2.)

The bases for my knowledge and for the foregoing charges, are, in part, as follows:

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3. This investigation has relied in part on a confidential source (the "CS") for the FBI. The CS has been providing information to the FBI at various points between 2009 and the present. The CS was arrested in 2009 and ultimately pleaded guilty to crimes related to mail and wire fraud. He cooperated with authorities after being charged, and his previous case has concluded. The CS is continuing to provide information to the FBI and is not being compensated for his information. The CS's information has proven reliable and has been corroborated by independent evidence.

4. The CS works in the real estate industry. The CS has a limited liability company that purchases foreclosed properties in multiple states for re-sale subsequent to renovation. Based on my debriefings of the CS, I learned that the CS is acquainted with ILYA PETROV, a/k/a "Soldat," and SUREN GADAYAV, the defendants. The CS also told me that he was aware that PETROV had arranged for the CS's cousin (the "Cousin") to be assaulted on two occasions in or about 2012 as a result of a business arrangement that went bad.

5. I have spoken to the Cousin, who told me the following:

a. The Cousin grew up with ILYA PETROV, a/k/a "Soldat," the defendant, as friends. In 2012, PETROV recommended a clinic in Mexico (the "Clinic") that the Cousin could attend to deal with narcotics addiction. The Cousin went to the Clinic, after which his problems with narcotics improved significantly.

2

          b.    The Cousin agreed with the doctor of the Clinic (the "Doctor") to refer patients in exchange for $500 per patient to be paid to the Cousin. Subsequently, PETROV learned of the arrangement and told the Cousin that he felt cheated, and proposed that they work together to recruit patients. The Cousin and PETROV then began recruiting patients for the Clinic.

          c.    During a trip to the Clinic in June 2012, PETROV got into an argument with the Doctor regarding the money to be paid per patient, and PETROV left Mexico on his own. Neither the Cousin nor PETROV was paid by the Doctor.

          d.    From the United States, PETROV called the Cousin in Mexico and demanded that the CS pay PETROV $3,000 for the patients that they had just referred to the Clinic. PETROV told the Cousin he would be waiting at the airport when the cousin arrived back in the United States and would "break out" the Cousin's teeth if the Cousin didn't pay. PETROV was not at the airport when the Cousin arrived, but later night later they had a confrontation in which PETROV challenged the Cousin to a fight.

          e.    In September 2012, while leaving his workplace at a barbershop, the Cousin was assaulted by two males who punched him in the face and hit him with a baseball bat. The assailants fled when others came out of the barbershop. The next month, as he was walking up the stairs in his building, the Cousin was again assaulted by a male, and hit in the head with a baseball bat. The Cousin went to the hospital as a result of injuries. Following the first assault, PETROV told the Cousin that he had arranged the assault. Following the second assault, PETROV told the Cousin, in substance, that he would continue to harm the Cousin if he did not pay.

          f.    SUREN GADAYEV, the defendant, arranged a meeting between the Cousin and PETROV to discuss the $3,000. At the meeting, the Cousin agreed to pay the $3,000 and PETROV agreed to stop harming the Cousin. The Cousin ultimately paid PETROV $3,000.

          6.    I have reviewed text messages on the Cousin's phone between the Cousin and ILYA PETROV, a/k/a "Soldat," the defendant, using a phone with a call number ending in 8808 (the "Petrov Phone"). In one text message on July 14, 2012, PETROV wrote "U got two hours to have my money ready. If u don't, I will crack u in every possible way." In another text message on July 22, 2012, PETROV wrote "U gonna be bold by the time I'm

3

done with u. I will wait for u by ur house, by ur business. I will not let u walk in new York or live in peace. I will get my money either way, [Cousin]. I'm coming for u. And I will catch u."

       7.    Based on my further debriefings of the CS, I learned the following:

          a.    In the summer of 2013—subsequent to the assaults on the CS's Cousin referenced above—SUREN GADAYEV, the defendant, approached the CS and told the CS that he was having financial difficulties. GADAYEV offered to provide "security" for the CS for money, but the CS responded that he did not need any security. However, the CS offered to mentor GADAYEV in the real estate industry, specifically, by helping GADAYEV to purchase and flip a property.

          b.    In the summer of 2013, the CS had arranged to purchase a property on Laurelton Drive in Mastic Beach, New York (the "Laurelton Property"). At the time of his conversation with GADAYEV regarding real estate, the CS had a Memorandum of Sale ("MOS") for the Laurelton Property but had not closed on the property. The CS offered to assign the MOS to GADAYEV for the deposit price that the CS had put down on the Laurelton Property. In other words, the CS did not intend to make a profit by assigning the MOS to GADAYEV. GADAYEV accepted the offer.

          c.    Shortly thereafter, GADAYEV informed the CS that ILYA PETROV, a/k/a "Soldat," was going to be his business partner and that GADAYEV and PETROV had set up a corporation to purchase the property (the "Corporation"). The CS also discussed these arrangements with PETROV, and learned from PETROV that he would be taking out loans from associates in the diamond industry on 47th Street in Manhattan to finance the purchase of the Laurelton Property.

       8.    I have reviewed a document showing that the MOS was transferred by the CS's company to the Corporation. I have also reviewed the closing documents for the Laurelton Property, and learned that the Corporation purchased the property on or about December 12, 2013 for approximately $51,500.

       9.    Based on my debriefings of the CS subsequent to the purchase of the Laurelton Property by the Corporation, I learned the following:

4

    a. The CS helped ILYA PETROV, a/k/a "Soldat," and SUREN GADAYEV, the defendant, find contractors to renovate the Laurelton Property, and also agreed to help find a buyer for the property after it was renovated. The CS did not ask for and was not compensated for any of this assistance. Over the course of 2014, the Laurelton Property was renovated and then placed on the market.

    b. The Corporation took out additional loans to renovate the Laurelton Property.

    c. In November 2014, a prospective buyer agreed to purchase the Laurelton Property for $109,000. The purchase price was less than the amount that GADAYEV and PETROV had paid to purchase and renovate the property, including through loans, and would therefore result in a loss rather than a profit to GADAYEV. The loss, according to PETROV, was approximately $35,000.

    d. When PETROV learned that he was going to lose money on the re-sale of the Laurelton Property, he claimed that the CS had promised he would make a profit. PETROV demanded that the CS "cover the loss" because PETROV owed a lot of money to people on 47th Street in Manhattan. The CS initially told PETROV that he would not cover the loss.

   10. On November 14, 2014, the CS met ILYA PETROV, a/k/a "Soldat," and SUREN GADAYEV, the defendants, at a Burger King parking lot in Rego Park, New York (the "Burger King"). Prior to the meeting, I placed an audio recording device on the CS. I and other agents also conducted surveillance of the meeting, and saw the CS meet with PETROV and GADAYEV. The conversation between the CS, PETROV and GADAYEV took place in Russian. Based on my review of a translation of the conversation made by a Russian translator for the FBI, I know that during the meeting, PETROV and GADAYEV demanded that the CS make up their anticipated losses from flipping the Laurelton Property. At one point, PETROV suggested he would be satisfied if the CS paid him $10,000. Specifically, based on my review of the transcript, I know that the following exchanges, among others, occurred:

> PETROV: That's why I'm telling you up front. You shouldn't . . . . If you get offended, then get offended. I am just a person who does what he says. That's who I am known as, bro. If I say something, I do it, no matter what.

5

GADAYEV:  You know, it is proposed to you, that everything will be closed. [UI]

PETROV:  You must understand, you say, that "I get mad at you." How can you--you say, mad. I should be getting mad at you right now, since I'm losing face everywhere. What are you saying? Look at your own words and analyze them.

CS:  Listen, I-I can't--I can't tell you who you borrowed money from, what you did, how you did. I understand you.

GADAYEV:  [UI]

PETROV:  Listen, you said, friends, you say this. No problem! You must understand, in this life . . . I am not going to teach you about life, bro. You have a father. You have a mother. God bless that they are healthy. They taught you about life themselves, raised you. And how you think after that, it's on you. That I can cause you a scare. I don't care about it. I--I will step away, goodbye.

CS:  Why did you mention other people, in this conversation?

. . .

CS:  When I came to you, I told you that I--I know you, right?

PETROV:  That's it, that's it, that's it. Listen, let's keep it that way. I'm a shitty person. With thrill seeking behaviors.

CS:  What does shitty have to do with it?

PETROV:  I'm just saying overall.

CS:  What does shitty have to do with it?

PETROV:  I'm with thrill seeking behaviors.

6

CS:        Yeah, but it's not that . . . I-I . . .
Listen--

PETROV:    Like I said, time reveals all.

CS:        I have to-I have to simply...you know
what I mean?

PETROV:    Listen, time . . . We still have to
live for a long, long time. Raise children.

. . .

PETROV:    Listen, it's all good, you don't have
to, I don't know, problem . . . you don't have
problems. Fix it all. I--You must understand, if
I say something to a person, you have a problem
with me, in that case they have problems with me.
Like when your cousin fucked me over money. I
told him, I will fuck you up. You know? I told
him that. We don't have that. That I am
disappointed, yes I am. I cannot--I cannot say,
what I do not feel because that would make me a
bitch ass motherfucker inside, a hyena. I'm not a
fucking hyena. I talk directly with people. Why
am I disappointed? Why am I disappointed? I'll
tell you clearly. Given your words and your
actions. That's all it is. [U/I] this, you know?
A dude . . . Well, everybody has their own
problems. You have your problems. He has his own
problems. You know? And how we help each other in
this life . . . how it works, right?

CS:        Yeah.

. . .

PETROV:    Bro, you are saying very wrong words. I
will tell you, if I wanted to give you heartburn,
I would have come directly there.

CS:        [laughter]

PETROV:    That's who I am. Yo, that's who I am.
And I would come myself. Trust me. And you're--
and you're not even going to know how I knew that
you're there.

7

>CS: Why?
>
>PETROV: That's the kind of dude I am. I will come and you will not even know yourself how he knew that I am there.

11.  Based on my training, experience, and participation in this investigation, I believe that during this meeting, PETROV and GADAYEV were threatening harm to the CS if the CS did not pay them. During the call, PETROV made references to the CS's family and the "long" life the CS had ahead of him. PETROV also made reference to the previous assaults he arranged on the CS's cousin, and told the CS that he would find the CS when the CS did not expect it ("I will come and you will not even know yourself how he knew that I am there").

12.  On November 24, 2014, I and other law enforcement agents met with the CS. In our presence, the CS placed a recorded call to ILYA PETROV, a/k/a "Soldat," the defendant, using the Petrov Phone, in which PETROV and the CS discussed the money that PETROV wanted the CS to pay. PETROV and the CS then agreed to meet at the Burger King. I then equipped the CS with a recording device, and conducted surveillance in the vicinity of the Burger King. During surveillance, I saw the CS meet with SUREN GADAYEV, the defendant. ILYA PETROV, a/k/a "Soldat," the defendant, showed up a short time later. The conversation between GADAYEV, PETROV and the CS was in Russian. Based on my review of a translation of that conversation prepared by a Russian translator for the FBI, I learned that the conversation between GADAYEV and the CS included, among other exchanges, the following:

>GADAYEV: You are going to a wrong direction [UI] . . . wrong direction, do you understand me? Let me explain it to you. You'd rather close it down [U/I] because you know what type of principal is he going to have? I'll tell you it now, because I know what is going to happen. You don't know the guy like I know. I am trying to hold back everything [U/I] in order everything to go in a peaceful way. He did not earn anything [UI] I've already told you--if he thinks [UI] it is my loss, it is not his loss, it is not your loss, it is my loss.

8

. . .

>GADAYEV: You told me personally that this Sunday you are going to close ten thousand. You would have been over. That's it. He did not show up on closing and everything is over, everything... that's it; [UI] I am . . . If you feel like it's my loss, I am going reimburse you, but right now I can't. It is better for you close it. I am telling you now. There is nothing going on unless it gets personal. You understand? He is going to push it personal, because if it does not get closed, his face is on the line. You should understand it properly. He took money from somebody. I am not lying to you.

. . .

>CS: I said that I pay him. [UI]. I'll give, I'll give, I am scared.
>
>GADAYEV: Today is Sunday. Do not be scared, do not be scared, do the right thing.
>
>CS: [UI] honestly?
>
>GADAYEV: Of course that is right thing.

    13.  Based on my training, experience, and participation in this investigation, I believe that during the exchanged discussed in paragraph 12, SUREN GADAYEV, the defendant, was warning the CS that ILYA PETROV, a/k/a "Soldat," the defendant, would physically harm him if the CS did not pay ("I am trying to hold back everything [UI] in order everything to go in a peaceful way" // "It is better for you close it. I am telling you now. There is nothing going on unless it gets personal. You understand? He is going to push it personal").

    14.  In addition to the November 24, 2014 call discussed above, the CS has placed other recorded calls to ILYA PETROV, a/k/a "Soldat," the defendant, in which the CS and PETROV discussed the money that PETROV wanted the CS to pay. During some of these calls, the CS was located in Manhattan.

    15.  I have reviewed closing documents for the re-sale of the Laurelton Property, and learned that in December 2014,

9

the Corporation sold the Laurelton Property to a buyer for $109,000.

16.  Based on my discussions with the CS, I know that on or about December 22, 2014, the CS received multiple calls from ILYA PETROV, a/k/a "Soldat," the defendant, in which PETROV indicated that he was back in town, needed to go to his attorney's office with respect to closing documents on the Laurelton Property, and wanted the CS to meet PETROV there to pay him. The CS attempted to reach the FBI prior to this meeting but was unable to, and attended the meeting. According to the CS, at the meeting, PETROV told the CS that he needed to pay approximately $12,000. PETROV insisted that the CS had to "make it right." The CS was intimidated and wrote PETROV two checks for approximately $6,000 each. The checks were written from the CS's real estate company's account. One of the checks was dated for December 22, 2014, and the other was postdated for January 15, 2015.

17.  After the December 22, 2014 meeting between the CS and ILYA PETROV, a/k/a "Soldat," the defendant, I instructed the CS to stop payment on the checks. The CS was unable to stop payment on the first check, which PETROV deposited. I have reviewed a copy of the deposited check obtained by the CS from his bank. The CS was able to stop payment on the January 15, 2015 check.

18.  On January 14, 2015, the CS spoke to ILYA PETROV, a/k/a "Soldat," by telephone. The call was recorded, and a translation of the call is being made. Based on my discussions with the CS, I know that, in substance, during the call, PETROV told the CS he was going to deposit the check on January 15, and the CS told him that it was fine to do so.

19.  Based on my discussions with the CS, who communicated with his bank, he is aware that according to the bank, the individual who deposited the check referenced in paragraphs 17 and 18 above would not have found out until January 22, 2015 that the check did not clear.

20.  On or about January 22, 2015, ILYA PETROV, a/k/a "Soldat," placed a call to the CS, which was recorded. I have reviewed a recording of the call, portions of which were in English and portions of which were in Russian. During the English portions of the call, PETROV asked the CS about the stopped check, and the CS acknowledged stopping payment because he felt that he did not know PETROV any money. PETROV told the

CS, among other things, that he was "not going to leave it alone"; that "if [the CS doesn't] resolve this, there's going to be a problem"; and not to make up excuses. PETROV also told the CS that "you and your cousin are alike" and that "if you feel threatened, I don't give a fuck what you do."

  21. I have spoken with another agent who interviewed the CS's father (the "Father"), and learned that the Father stated the following:

   a. At night on January 22, 2015, SUREN GADAYEV, the defendant, came to the Father's house. The Father had met GADAYEV on a couple of occasions.

   b. GADAYEV was angry and told the Father that he was looking for the CS. GADAYEV said the CS had written him a $6,000 check that had bounced, and that he needed the money.

   c. The CS's father responded to GADAYEV that GADAYEV should not have come to his house "like mafia" and that the CS had done GADAYEV a favor.

   d. GADAYEV, without prompting, told the Father that PETROV would not hurt the CS.

11

WHEREFORE, the deponent respectfully requests that ILYA PETROV, a/k/a "Soldat," and SUREN GADAYEV, the defendants, be imprisoned, or bailed, as the case may be.

_____
NAUSHAUN C. RICHARDS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
25th day of January, 2015.

_____
THE HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK